**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| NICHOLAS SDOUCOS, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, NICHOLAS SDOUCOS ("Plaintiff"), by and through undersigned counsel, sues the Defendant, BANK OF AMERICA, N.A. ("Defendant" or "Bank of America"), on behalf of himself and all others similarly situated, and alleges:

**INTRODUCTION**

1.      Like most adult Americans, Plaintiff Nicholas Sdoucos has a credit card. And like many Bank of America cardholders, Mr. Sdoucos set up automatic payments to ensure the balance would be paid each month. After all, according to Bank of America, automatic payments "remove some of the stress and time pressure of paying your bills."[1]

2.      But Bank of America's automatic payment system did not remove stress or "streamline the bill-paying process"[2] for Plaintiff. Instead, Bank of America abused its automatic payment system to double-charge Plaintiff over $2,000 simply because he made the responsible financial decision to pay off his card balance in the middle of a billing cycle. Although Plaintiff had paid off his statement balance, leaving a balance of zero, Bank of America's confusing and misleading automatic payment system debited his account a second time. Bank of America's conduct overpaid Bank of America and left Plaintiff thousands of dollars in the lurch.

---

[1] Bank of America, *How to manage your bills: A step-by-step guide*, https://bettermoneyhabits.bankofamerica.com/en/saving-budgeting/how-to-manage-bills
[2] *Id.*

1

3.      Plaintiff is one of millions of Americans who use automatic payments to help manage their credit card payments and avoid credit card debt, which can burden cardholders with high-interest debt and oppressive fees. At the end of 2022, credit card debt surpassed $1 trillion for the first time.[3] By some measures, credit cards are the most expensive they have ever been, as issuers charged more than $130 billion in interest and fees in 2022 alone.[4] Since 2019, credit card holders saw automatic payment enrollment rise four to seven percentage points on average.[5]

4.      Automatic payments are a mechanism used by consumers as a way to avoid accrual of interest and late fees.[6] Bank of America, like many banks, urges cardholders to use automatic payments.[7]

5.      Typically, consumers who want to set up automatic payments may provide the credit card issuer with deposit account information online or via a mobile application and then authorize recurring automatic payments.[8]

6.      Most credit card issuers allow cardholders to choose to automatically pay (1) their minimum amount due, (2) their total balance reflected on their most recent billing statement, or (3) a fixed monthly amount.[9]

7.      When a consumer chooses to pay the minimum amount due, the minimum amount due on the consumer's most recent statement will be automatically withdrawn from the consumer's deposit account every month on or before the corresponding due date. If there is a remaining balance, that balance will carry over to the next month—unless the cardholder makes an additional payment—and accrue interest according to the cardholder's agreement with the issuer. As a result,

---

[3] Consumer Financial Protection Bureau, *The Consumer Credit Card Market,* 132 (Aug. 2019), https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-card-market-report_2023.pdf (last visited November 10, 2025)

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Bank of America, *How to manage your bills: A step-by-step guide*, https://bettermoneyhabits.bankofamerica.com/en/saving-budgeting/how-to-manage-bills

[8] Consumer Financial Protection Bureau, *The Consumer Credit Card Market, supra* note 3.

[9] *Id.*

2

the minimum amount due option is the costliest for the cardholder in the long run and most profitable for the credit card issuer.

8.     When a consumer chooses to pay the statement balance every month (or the full balance due, i.e., the statement balance plus any additional purchases), an amount equivalent to the total balance on the account will be withdrawn from the consumer's deposit account such that no balance will carry over to the next month. This option results in the least amount of accrued interest for the cardholder and the least profit for the credit card issuer.

9.     If a consumer selects a fixed monthly amount, a fixed amount selected by the card holder will be withdrawn from their deposit account every month regardless of the statement balance or minimum amount due.

10.     Bank of America offers cardholders two options: total minimum payment due and statement balance. It does not allow cardholders to choose to make automatic payments in a fixed amount or a statement balance plus additional purchases during the billing cycle.

11.     Reasonable consumers would expect that choosing to pay their "statement balance," as opposed to the "minimum payment," is connected to paying off the prior statement balance. The point of automatically paying the "statement balance" each month is to completely pay the statement balance off.

12.     As a result, reasonable consumers would also expect that if they make a one-time payment during the billing cycle to pay their statement balance, in whole or in part, before the automatic payment comes due, Bank of America would not bill them for the full statement balance *again*. After all, no "statement balance" would remain to be paid off.

13.     Yet Bank of America does just that. If a cardholder like Plaintiff pays all or part of their statement balance mid-cycle, Bank of America does not adjust its automatic payment to account for the earlier payment. Instead, it simply double-dips, re-billing the cardholder for the amount they already paid.

3

14. Bank of America profits from retaining this money that it snatches from customers' accounts without notice or warning, refuses to pay interest on the amounts wrongfully taken, and requires consumers to navigate unreasonable hurdles to obtain refunds.

15. Plaintiff suffered injury when Bank of America double-billed him over $2,000 after he paid his statement balance off mid-cycle, and he brings this action to recover those funds for himself and others similarly situated.

## PARTIES

16. At all times herein mentioned, the Plaintiff, Nicholas Sdoucos, was and still is a natural person, residing in Cook County, Illinois.

17. At all times herein mentioned, Defendant, BANK OF AMERICA, N.A., was a corporation duly organized and existing under and by virtue of the Laws of the State of North Carolina, with a principal place of business in North Carolina.

## JURISDICTION AND VENUE

18. This Court has personal jurisdiction over Bank of America because it does business in this district and the conduct complained of herein occurred in this district.

19. This Court has subject matter jurisdiction over the Action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one Class Member is a citizen of a state different from Defendant.

20. Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## COMMON FACTUAL ALLEGATIONS

21. Bank of America provides customers with a variety of credit and banking services. Among these are several credit card options. A credit card allows the cardholder to borrow money to pay for goods and services. Each time the cardholder uses the credit card to pay for a purchase, the amount of the purchase adds to the balance of the card.

22. Cardholders may access their account information on Bank of America's online portal. Accessible information includes an itemized balance owed on the credit card, the payment due date, the minimum amount due, and any interest charges or fees incurred.

23. Each billing cycle, at any point in the billing cycle, Bank of America credit card holders may pay anywhere from the minimum payment set forth in the customer's monthly statement up to the full statement balance. Bank of America's cardholder agreement provides that card holders may pay the entire amount owed to Bank of America at any time.

24. Bank of America's account agreement states that "[E]ach billing cycle, you must pay at least the Total Minimum Payment Due shown on your monthly statement by its Payment Due Date. The Total Minimum Payment Due is the sum of all past due amounts plus the Current Payment." The "Current Payment," in turn, includes "(1) 1.00% of your balance," "(2) new interest charges," and "(3) any new Late Fee," but will not be less than $35.00.

25. Bank of America promises that "Payments are allocated to posted balances."

26. Bank of America also offers its customers the ability to set up automatic payments through its website. Automatic monthly payments help customers avoid late fees by ensuring that they make a payment each month.

27. Customers who want to set up automatic payments can do so by logging into their Bank of America account online. Through Bank of America's website, customers can set up automatic payments by providing their deposit account information to Bank of America so that Bank of America can withdraw their chosen payment amount each month on a designated payment date.

28. Cardholders may elect to set up automatic payments for the "Minimum Payment," referring to the Total Minimum Payment Due that the card agreement requires cardholders to pay each month, or the "Statement Balance." According to Bank of America, the "Statement Balance" means the "New Balance Total, as shown on the credit card statement. This option will pay your statement in full. We will not charge you interest on purchases if you always pay your entire New Balance Total by the Payment Due Date each month. This is not a payoff amount."

29. Notably, "New Balance Total" is not defined in the cardholder agreement or on the webpage where cardholders can sign up for automatic billing. But since Bank of America promises that "This option will pay your statement in full," reasonable consumers understand this option to mean that it is intended to pay off the statement in full, unlike the minimum payment option.

30. These descriptions are misleading because Bank of America does not disclose to its customers that if they set up automatic payments using the "Statement Balance" option, Bank of America will automatically debit their account for the amount of the "New Balance Total" *even if* the customer has already paid all or part of that amount earlier in the month. Despite stating only that "This option will pay your statement in full," Bank of America takes the full payment amount a second time, without notice or warning, even if the statement was already paid in full.

31. This practice is unexpected and unfair to consumers because it is in contrast to the practices of other large competitor banks. For example, when Capital One Bank customers set up automatic payments, the automatic payment amount is reduced by other payments made between the statement issuance date and the day before the scheduled payment, and Chase Bank will not debit the account if the consumer has a zero dollar balance at the time of the scheduled automatic payment.

32. Capital One Bank also gives customers the option to keep or cancel their scheduled automatic payments when they make a mid-billing cycle payment, at the time of the payment.

33. Chase Bank similarly adjusts its automatic payment methods to account for payment activity between the statement date and the payment date.

34. Wells Fargo Bank and CitiBank also use dynamic automatic payment features that account for payment activity between the statement date and the payment date when calculating and charging the automatic payment.

35. Bank of America's practice of double-debiting customer accounts the amount of the statement balance after they have already paid all or part of the amount is deceptive, unfair, and out of step with industry norms. Consumers have no way to anticipate that Bank of America will continue to bill them after they've paid off their statement, and no way to prevent this

overbilling, because Bank of America does not warn them of its practice until it has already taken their money.

## FACTS SPECIFIC TO PLAINTIFF

36. Plaintiff opened a Bank of America Unlimited Cash Rewards World Mastercard credit card in 2017. He opened the credit card for personal, family, or household uses.

37. Plaintiff chose to connect his credit card to his personal bank account at Charles Schwab and authorize automatic payments of the full balance owed so that the card is paid in full each month and no balance carries over.

38. Plaintiff chose the option to pay the statement balance due each month in order to avoid paying interest charges and fees.

39. Plaintiff set up automatic payments through Bank of America's website, authorizing Bank of America to withdraw monthly payments from his deposit account at Charles Schwab. He selected "Statement Balance," intending to cause Bank of America to withdraw the New Balance Total owed each month on or before its due date, thus avoiding interest charges and other fees under the credit card agreement.

40. Based on Bank of America's payment options, Plaintiff believed the "Statement Balance" option would cause Bank of America to only withdraw amounts equivalent to the total balance owed on his Bank of America credit card. He reasonably believed that if he paid the "Statement Balance" before the automatic payment date, he would not be charged again. After all, the purpose of choosing the option that will "pay your statement in full" was to pay the statement in full, not to pay it twice.

41. Plaintiff set up automatic payments to be paid one day before the credit card payment due date to prevent incurring interest or fees.

42. Plaintiff's statement for the period of September 14 - October 13, 2025 shows that he used his Bank of America credit card to pay for $3,044.88 in goods and services and remitted one payment for $1,000.00, leaving a balance of $2,044.88 on October 13, 2025.

7

43. Because Plaintiff had the funds in his Charles Schwab deposit account, he decided to pay the balance on his Bank of America credit card account sooner, rather than wait for the autopayment debit. On October 21, 2025, *twenty days* before the payment due date, Plaintiff logged into his Bank of America account and manually submitted a payment for $2,044.88, which was the total balance owed on his Bank of America account.

44. According to Bank of America's website, updates to its credit card balances could take up to two business days from the date on which payment is made. As such, Plaintiff's credit card statement should have reflected a zero balance on or before October 23, 2025, two business days after Plaintiff made his payment, and *eighteen days before the* payment due date.

45. After the Plaintiff's $2,044.88 payment on October 21, 2025, his credit card account had a zero balance.

46. Plaintiff logged into his Bank of America credit card account on November 9, 2025 and noticed that a payment in the amount of $2,044.88 was scheduled to automatically debt from his bank account on November 10, 2025, despite having a zero balance on his Bank of America credit card account.

47. Plaintiff immediately phoned Bank of America to address the apparent error. The Bank of America representative confirmed that: (1) the autopayment was set up to pay any outstanding balance on the account as of the payment due date and (2) there was, in fact, a zero balance on his account and the balance had been zero since October 21, 2025.

48. When pressed as to why Bank of America was attempting to debit funds despite a zero balance on the account, Bank of America's representative explained that it recently implemented new software which was not recognizing manual payments and that she had been fielding calls from many Bank of America customers who were experiencing the same issue as the Plaintiff.

49. When asked if there was a way to cancel or turn off the auto debit scheduled for November 10, 2025, he was told that there was nothing he could do to stop the double payment

from leaving his account. Instead, he was informed that he would have to wait for the money to be withdrawn, and then request a refund. He had no guarantee that the money would be refunded.

50.     Despite not owing Bank of America any money since October 21, 2025, Bank of America debited $2,044.88, which is now represented as a credit on Plaintiff's credit card account.

51.     Plaintiff reasonably believed that he had authorized Bank of America to automatically pay any balance owed on his statement. He had no reason to think that Bank of America would withdraw funds in excess of any balance owed, nor had he provided authorization to do so.

52.     Bank of America has caused the Plaintiff undue financial hardship by debiting funds to which it was not entitled, and which were earmarked for other family expenses. Bank of America has benefited from the use of Plaintiff's money in the meantime.

## CLASS ALLEGATIONS

53.     Plaintiff brings this action on behalf of himself and all other similarly situated under Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

54.     This action is brought on behalf of the named Plaintiff individually, and a class consisting of similarly situated consumers including all persons (1) with a Bank of America credit card (2) who enabled automatic payments through the Bank of America website, (3) selected the "statement balance" payment option, (4) made a mid-cycle payment, and (5) were still billed the full "New Balance Total" during the applicable statutes of limitations through the date a class is certified.

55.     Class members are identifiable through Defendant's records and payment databases.

56.     Excluded from the Class are the Defendant; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

57.     Plaintiff proposes that he serve as Class representative and that his counsel serve as Class Counsel.

58.     Plaintiff and the Class have all been harmed by the actions of Defendant.

9

59. Numerosity is satisfied. There are likely thousands of Class members. Individual joinder of these persons is impracticable.

60. There are questions of law and fact common to Plaintiff and to the Class, including, but not limited to:

a. Whether Defendant violated the North Carolina Unfair and Deceptive Trade Practices Act;

b. Whether Defendant violated the North Carolina Debt Collection Act;

c. Whether Defendant was unjustly enriched;

d. Whether Defendant unlawfully converted its customers' funds;

e. Whether Defendant owes a duty of good faith and fair dealing to its customers;

f. Whether Defendant violated the duty of good faith and fair dealing;

g. Whether Plaintiff and the Class were damaged by Defendant's conduct;

h. Whether Plaintiff and the Class are entitled to damages as a result of Defendant's actions;

i. Whether Plaintiff and the Class are entitled to restitution; and

j. Whether Plaintiff and the Class are entitled to attorneys' fees and costs.

61. Plaintiff's claims are typical of the claims of the Class members. Defendant offered the same automatic payment options to all Class members.

62. Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class members and Plaintiff will adequately and fairly protect the interests of the Class members. Plaintiff has hired skilled and experienced counsel to represent himself and the Class.

10

63.     Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of this controversy.

64.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**COUNT I**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq.***
**On Behalf of Plaintiff and the Class**

65.     Plaintiff realleges and incorporates by reference paragraphs 1-64 as if fully set forth herein.

66.     The claims of Plaintiff and the Class members are governed by North Carolina law under their uniform card agreements with Bank of America. The uniform card agreements state that "This Agreement is made in North Carolina and we will extend credit to you from North Carolina. This Agreement is governed by the laws of the State of North Carolina (without regard to its conflict of laws principles) and by any applicable federal laws."

67.     The North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1, *et seq.*, prohibits the use of "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75- 1.1(a).

68.     Defendant engaged in "commerce," as defined by N.C. Gen. Stat. § 75-1.1(b), when it offered credit cards to Plaintiff and the Class members from North Carolina.

69.     Defendant engaged in unfair and deceptive acts when it did not act in accordance with the payment options provided to and selected by the Plaintiff and Class members. The phrase "statement balance" implies that Bank of America will withdraw the full amount owed on the

credit card each month. Reasonable consumers would expect that by choosing "statement balance," they are choosing to pay off all amounts owed and that the Bank of America will not debit any amounts in excess of the balance owed to it. Further, Bank of America states that "This option will pay your statement in full," suggesting that the goal is to pay the statement—not to debit a fixed amount regardless of whether the statement was already paid.

70. Contrary to the expectations of reasonable consumers, Bank of America does debit consumer deposit accounts in excess of the balances which it is actually owed.

71. Bank of America does not disclose this practice to consumers when it entices them to sign up for automatic payments, and no consumers could discover this practice without signing up for automatic payments and suffering from a double-charge.

72. Plaintiff and the Class members selected "statement balance" believing they were choosing the option that would only debit their deposit accounts up to the amount that they owed. However, Bank of America initiated debits in excess of those amounts, and above and beyond what Plaintiff and the Class members had authorized.

73. Bank of America's practices are also oppressive and unfair because Bank of America takes advantage of its power or position over cardholders to debit their bank accounts after they have already made credit card payments. And by the time the automatic debit is underway, there is nothing consumers can do to stop it from processing.

74. Plaintiff and the Class members were harmed by this deceptive and unfair conduct.

75. Plaintiff and the Class members seek treble damages and reasonable attorneys' fees and costs.

76. To the extent required, this cause of action is being pled in the alternative.

**COUNT II**
**Violation of the North Carolina Debt Collection Act ("NCDCA")**
**N.C. Gen. Stat. § 75-50, *et seq.***
**On Behalf of Plaintiff and the Class (In the Alternative)**

77. Plaintiff realleges and incorporates by reference paragraphs 1-64 as if fully set forth herein.

78.     The claims of Plaintiff and the Class members are governed by North Carolina law under their uniform card agreements with Bank of America.

79.     Plaintiff and the Class members engaged in commerce when they took out Bank of America credit cards. Plaintiff opened his Bank of America credit card for personal, family, or household uses. See N.C. Gen. Stat. § 75-50(1).

80.     The NCDCA defines "debt collector" as "any person engaging, directly or indirectly, in debt collection from a consumer." N.C. Gen. Stat. § 75-50(3). The NCDCA applies to Defendant because it collects alleged debts arising out of consumer transactions.

81.     The NCDCA prohibits debt collectors like Defendant from using "any fraudulent, deceptive, or misleading representation" to collect a debt, including, but not limited to, "[f]alsely representing the status or the true nature of the services rendered by the debt collector or his business." See N.C. Gen. Stat. § 75-54(7).

82.     The NCDCA further prohibits debt collectors like Defendant from collecting or attempting to collect any debt by use of unconscionable means. See N.C. Gen. Stat. § 75-55. Bank of America used unconscionable means to collect a debt when it charged Plaintiff and the class members more than they owed by charging them again after they had already made mid-cycle payments toward their statement balances.

83.     The Defendant's conduct also violated N.C. Gen. Stat. § 75-54 generally (and § 75-54(7) specifically) because Defendant engaged in unfair and deceptive acts when it represented that Plaintiff and Class members could opt to automatically pay amounts owed to the Defendant, in full. The phrase "statement balance" implies that Bank of America will withdraw the full amount owed on the credit card each month. Reasonable consumers would expect that by choosing "statement balance" they are authorizing Bank of America to debit up to the total amount owed to Bank of America.

84.     Contrary to the expectations of reasonable consumers, Bank of America exceeds the authority granted to it by consumers by debiting amounts in excess of the total amount that it

is owed. Bank of America took *double* what Plaintiff owed on his statement balance when it debited $2,044.88 despite that his balance had been reduced to zero.

85.     Bank of America states that "This option will pay your statement in full," suggesting that the goal is to pay the statement—not to debit a fixed amount regardless whether the statement was already paid.

86.     Bank of America exceeded the authority given to it by Plaintiff and Class members by debiting amounts in excess of what it was lawfully owed.

87.     Plaintiff and the Class members were harmed by this conduct.

88.     Plaintiff and the Class members seek actual damages, as well as statutory damages, attorneys' fees, and equitable relief.

89.     This cause of action is being pled in the alternative to the NCUDTPA claims to the extent required by law.

### COUNT III
**Breach of the Implied Covenant of Good Faith and Fair Dealing On Behalf of Plaintiff and the Class**

90.     Plaintiff realleges and incorporates by reference paragraphs 1-64 as if fully set forth herein.

91.     When Plaintiff and the Class members opened credit cards with Bank of America, they entered into uniform card agreements with Bank of America.

92.     The claims of Plaintiff and the Class members are governed by North Carolina law under their uniform card agreements with Bank of America.

93.     Under North Carolina law, every contract contains an implied covenant of good faith and fair dealing. Under the covenant, neither party will do anything that injures the right of the other to receive the benefits of the agreement.

94.     In addition to the implied covenant that inheres in all contracts, Defendant owed a special duty to Plaintiff and the Class members as their creditor to act in good faith and fair dealing with them.

14

95. Under the uniform card agreements between Bank of America, on the one hand, and Plaintiff and the Class members on the other, Bank of America agreed that Plaintiff and the Class members could make payments to Bank of America at any time. Bank of America also promises that "Payments are allocated to posted balances."

96. The phrase "statement balance" implies that Bank of America will withdraw the full amount owed on the credit card pursuant to its customer's instructions—and after the balance is paid, there will be no reason to take more. Bank of America states that "This option will pay your statement in full," suggesting that the goal is to pay the statement—not to debit a fixed amount regardless whether the statement was already paid. Reasonable consumers would expect that by choosing "statement balance," Bank of America would debit amounts equivalent to amounts actually owed to Bank of America.

97. Further, debiting *more* than the "Statement Balance" is not consistent with the commitment to allocate payments to "posted balances." Once all or part of the Statement Balance has been paid, there is no "balance" left to allocate the payment to. For example, after Plaintiff made his mid-cycle payment, the balance left was "zero." Yet Bank of America withdrew a second payment. It could not have "allocated" this payment to a "posted balance" as it promised and instead just kept the money for its own use.

98. Contrary to the expectations of reasonable consumers, despite authorizing Bank of America to debit the amount owed to it (not more than that amount), Bank of America debited amounts in excess of what it was actually owed.

99. Plaintiff and the Class members selected "statement balance" believing they were choosing the option that would prevent them from having to pay more than they actually owed.

100. Despite only having authorization to debit amounts actually owed to it, Bank of America debited amounts in excess of what it was actually owed.

101. By debiting more than the outstanding balance despite its customers' instructions to debit only the balance owed, Bank of America did not act fairly and in good faith toward its

customers. Rather, Bank of America injured Plaintiff's and the Class members' right to receive a benefit under their card agreements.

102. Plaintiff and the Class members selected "statement balance" based upon the reasonable belief that this option would enable them to take advantage of the right to pay off their statement balance at any time and not have to pay more than what was actually owed. By debiting amounts in excess of the outstanding balance, Bank of America breached the covenant of good faith and fair dealing.

103. Plaintiff and the Class members were harmed due to this breach.

## COUNT IV
### UNJUST ENRICHMENT
### On Behalf of Plaintiff and the Class

104. Plaintiff realleges and incorporates by reference paragraphs 1-64 as if fully set forth herein.

105. The claims of Plaintiff and the Class members are governed by North Carolina law under their uniform card agreements with Bank of America.

106. Plaintiff and the Class members conferred benefits on Defendant; namely, Plaintiff and the Class members paid their credit card bills, including amounts in excess of what was actually owed to the Defendant due to Defendant's deceptive payment practices.

107. Defendant's retention of these benefits is unjust because Defendant unfairly profited off debits in excess of the amounts actually due to the Defendant which the Defendant charged to the Plaintiff and the Class members.

108. Plaintiff and the Class members are entitled to restitution and Defendant is required to disgorge the benefits it unjustly obtained.

109. This claim is pled in the alternative to Count III to the extent required by North Carolina law.

**WHEREFORE**, the Plaintiff prays for the following relief:

1. An Order certifying the proposed Class and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

2. Monetary and/or equitable relief in an amount to be determined at trial;

3. Statutory damages and/or penalties, including treble damages and statutory damages as authorized by law;

4. Punitive or exemplary damages;

5. Pre- and post-judgment interest to the extent provided by law;

6. Attorneys' fees and costs of suit, including costs of notice, administration, and expert fees; and

7. Such other legal or equitable relief, including injunctive or declaratory relief, as the Court may deem appropriate.

<b>PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.</b>

Date: November 11, 2025           Respectfully submitted,

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei
Katherine M. Aizpuru (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, D.C. 20006
Telephone: 202-973-0900
E-mail: hzavareei@tzlegal.com
E-mail: kaizpuru@tzlegal.com

F. Peter Silva, (*pro hac vice* to be filed)
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 202-973-0900
E-mail: psilva@tzlegal.com

Shaun Spector, Esq. (*pro hac vice to be filed*)
**The Law Offices of Shaun Spector, PLLC**
2332 Galiano Street, Second Floor
Coral Gables, Florida 33134

Telephone: (786) 571-7110
E-mail: Shaun@ShaunSpectorLaw.com

18