IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NICHOLAS SDOUCOS, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Case No. 1:25-CV-13845 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BANK OF AMERICA, N.A.'S MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................................... 1

BACKGROUND ............................................................................................................................. 3

    I.       BANK CREDIT CARD TERMS ................................................................................ 3

    II.     THE BANK'S AUTOMATIC PAYMENT SERVICE ........................................... 5

    III.   SDOUCOS'S AUTOMATIC PAYMENT ............................................................... 6

ARGUMENT .................................................................................................................................. 8

    I.       THE COMPLAINT MUST BE DISMISSED UNDER RULE
           12(B)(1) BECAUSE SDOUCOS LACKS STANDING ........................................ 8

    II.     THE COMPLAINT SHOULD BE DISMISSED UNDER 12(b)(6)
           FOR FAILURE TO STATE A CLAIM .................................................................. 10

           A.     The Complaint Does Not Plead a NCUDTPA or NCDCA
                   Violation ...................................................................................................... 10

           B.     Sdoucos Has Not Pleaded an Implied Covenant Claim ........................... 13

           C.     The Agreement Bars Sdoucos's Unjust Enrichment Claim ...................... 15

CONCLUSION .............................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bazile v. Fin. Sys. of Green Bay, Inc.*,
983 F.3d 274 (7th Cir. 2020) ................................................................................ 7, 9

*Booe v. Shadrick*,
369 S.E.2d 554 (N.C. 1988)..................................................................................... 15

*Bui v. Zuru LLC*,
2024 WL 5680719 (C.D. Cal. Aug. 8, 2024)............................................................ 10

*Carpenter v. William Douglas Mgmt., Inc.*,
132 F.4th 280 (4th Cir. 2025) ................................................................................. 11

*Cross v. Ciox Health, LLC*,
438 F. Supp. 3d 572 (E.D.N.C. 2020) ..................................................................... 15

*Dalton v. Camp*,
548 S.E.2d 704 (N.C. 2001)...................................................................................... 11

*DIRECTV, Inc. v. Cephas*,
294 F. Supp. 2d 760 (M.D.N.C. 2003) ..................................................................... 11

*Esco v. City of Chicago*,
107 F.4th 673 (7th Cir. 2024) .................................................................................... 7

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)................................................................................................... 9

*Gadelhak v. AT&T Servs., Inc.*,
950 F.3d 458 (7th Cir. 2020) ..................................................................................... 9

*Gay v. Peoples Bank*,
2015 WL 3650090 (N.C. Super. Ct. June 10, 2015) *aff'd*, 2016 WL 1743355
(N.C. Ct. App. May 3, 2016) ..................................................................................... 11

*Gaynoe v. First Union Corp.*,
571 S.E.2d 24 (N.C. Ct. App. 2002)......................................................................... 11

*Hancock v. Americo Fin. Life & Annuity Ins. Co.*,
378 F. Supp. 3d 413 (E.D.N.C. 2019) ..................................................................... 14

*In re Recalled Abbott Infant Formula Prods. Liability Litig.*,
97 F.4th 525 (7th Cir. 2024) ...................................................................................... 9

*Int'l Union of Operating Eng'rs, Loc. 139, AFL-CIO v. Daley*,
983 F.3d 287 (7th Cir. 2020) ..................................................................................... 8

*JTG Equip. & Supply, LLC v. EBay, Inc.*,
2015 WL 303589 (N.C. Super. Jan. 23, 2015) ........................................................ 13

*Liris S.A. v. Morris & Assocs., Inc.*,
496 F. Supp. 3d 931 (E.D.N.C. 2020) ..................................................................... 14

*Manos v. Freedom Mortg. Corp.*,
   2022 WL 874181 (4th Cir. Mar. 24, 2022).................................................................... 12

*McCauley v. City of Chicago*,
   671 F.3d 611 (7th Cir. 2011) .......................................................................................... 10

*Orr v. Shicker*,
   147 F.4th 734 (7th Cir. 2025) ......................................................................................... 10

*Parvati Corp. v. City of Oak Forest*,
   630 F.3d 512 (7th Cir. 2010) ............................................................................................ 9

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976)........................................................................................................... 9

*Petro-Chem Processing, Inc. v. E.P.A.,*
   866 F.2d 433 (D.C. Cir. 1989)........................................................................................... 9

*Pope v. TT of Lake Norman, LLC*,
   505 F. Supp. 2d 309 (W.D.N.C. Aug. 28, 2007) ........................................................... 13

*Rich Food Servs., Inc. v. Rich Plan Corp.*,
   98 F. App'x 206 (4th Cir. 2004) ..................................................................................... 14

*Rider v. Aderhold*,
   2013 WL 3776961 (N.C. Ct. App. July 16, 2013)........................................................... 13

*Rosenblum v. Travelbyus.com Ltd.*,
   299 F.3d 657 (7th Cir. 2002) ............................................................................................. 3

*Solum v. Certainteed Corp.*,
   147 F. Supp. 3d 404 (E.D.N.C. 2015) ............................................................................ 13

*VRX USA, LLC v. VRX Ventures, Ltd.*,
   2020 WL 7229672 (W.D.N.C. Dec. 8, 2020)................................................................. 14

*Waddell v. U.S. Bank Nat'l Ass'n*,
   395 F. Supp. 3d 676 (E.D.N.C. July 29, 2019)............................................................... 11

*Wertymer v. Walmart, Inc.*,
   142 F.4th 491 (7th Cir. 2025) ......................................................................................... 10

*Williams v. Pegasus Residential, LLC*,
   2019 WL 4305989 (M.D.N.C. Sept. 11, 2019) .............................................................. 11

*Wireless Commc'ns, Inc. v. Epicor Software Corp.*,
   2011 WL 90238 (W.D.N.C. Jan. 11, 2011)..................................................................... 15

## PRELIMINARY STATEMENT

Courts applying North Carolina law[1] have consistently held that when a financial institution does precisely what it tells customers it will do, such conduct is not unfair or deceptive. Here, Bank of America, N.A. (the "Bank") explicitly told Plaintiff Nicholas Sdoucos ("Plaintiff" or "Sdoucos") several times, both in the applicable contract and again when he selected his automatic payment options through the Bank's website, that if he selected the "Statement Balance" automatic payment option, the Bank would pay the "New Balance Total"— i.e., the total billed amount as of the Closing Date of a billing cycle—as shown on his monthly statement. Sdoucos enrolled in automatic payments and instructed the Bank to pay his "Statement Balance" on the day before the payment was due. His monthly statement for the billing cycle closing on October 13, 2025 ("September/October Billing Cycle"), showed a total billed amount of $2,044.88 as of the cycle close, and a November 10, 2025 payment due date. On November 10, 2025,[2] the Bank processed a $2,044.88 payment: the Statement Balance as shown in Sdoucos's monthly statement. This is exactly what the Bank said it would do if he selected the Statement Balance option. But because Sdoucos had made an intervening $2,044.88 manual payment on October 21, 2025 (after the September/October Billing Cycle closed and the statement was issued) without canceling his already scheduled automatic payment, and had not made any subsequent purchases or charges, the scheduled automatic payment resulted in a $2,044.88 credit balance to Sdoucos's account.

Sdoucos alleges that he first noticed the scheduled November 10 automatic payment on Sunday, November 9, and called Bank customer service that day. While canceling the then in-

---

[1] The Complaint alleges that North Carolina law applies to Sdoucos's claims (Compl. ¶¶ 66, 78, 93, 105), which for purposes of this motion to dismiss Bank of America has applied.

[2] Because November 9, 2025, was a Sunday, the payment was processed the following day.

process automatic payment was not possible, the Bank offered to refund the October 21 manual payment. Sdoucos voluntarily and explicitly rejected this refund even though it would have entirely avoided the $2,044.88 credit balance (which is his alleged injury) altogether. The Bank also told Sdoucos that if he called after the automatic payment posted the next day, he could request an expedited refund of the resulting $2,044.88 credit, which would return the money in one to three business days. Sdoucos, however, rejected this solution as well.

Instead, Sdoucos filed this lawsuit on November 11, 2025, the day after the payment posted, claiming the Bank engaged in unfair and deceptive practices because it did not adjust or cancel his scheduled automatic payment after his manual payment reduced his balance to zero. But such supposedly preferable action would not have been consistent with the Bank's clear disclosure that selecting "Statement Balance" would pay the amount shown on his credit card statement, not some other dynamic amount reflecting subsequent transactions. Nor can Plaintiff reconcile this claimed unfairness with the Bank offering to refund his manual payment (which would have avoided the $2,044.88 credit balance) when he raised the issue on November 9; a refund that Sdoucos rejected to file this 109-paragraph lawsuit two days later.

Plaintiff's Complaint thus should be dismissed for at least two independent reasons. First, Sdoucos lacks standing because any injury he suffered was self-inflicted in an attempt to manufacture a lawsuit. Sdoucos's alleged injury, the temporary loss of use of $2,044.88, would have been avoided entirely if he accepted the Bank's refund, which it offered even before the automatic payment had been processed. The law is clear that self-inflicted injuries cannot give rise to standing under Article III.

Second, the Complaint should also be dismissed for independent reasons under Rule 12(b)(6). Both the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") and

2

North Carolina Debt Collection Act ("NCDCA") require plaintiffs to plead an unfair or deceptive act or practice. Here, the Bank scheduled and processed the automatic payment consistent with its website disclosure, the applicable Bank Credit Card Agreement ("Agreement") (Ex. A),[3] and the instructions that Sdoucos admits he gave the Bank by selecting Statement Balance. Sdoucos's NCUDTPA and NCDCA claims (Counts 1 and 2) should therefore be dismissed because acting in accordance with the express terms of an account agreement does not constitute an unfair or deceptive act or practice under the NCUDTPA or NCDCA. Sdoucos's implied covenant claim (Count 3) should be dismissed because he seeks to imply and impose an obligation—adjusting scheduled automatic payments to reflect manual payments made *after* the billing cycle closes—that is inconsistent with the Agreement's express terms and language. And Sdoucos cannot state an unjust enrichment claim (Count 4) because he has affirmatively alleged that his relationship with the Bank is governed by the Agreement.

**BACKGROUND**

## I. BANK CREDIT CARD TERMS

Like all Bank credit card customers, Sdoucos voluntarily entered into a contract with the Bank, the "Credit Card Agreement." (Compl. ¶ 91; Ex. A (incorporated by reference at Compl. ¶¶ 7, 23–24, 28, 39, 66, 78, 91–92, 95, 105).)[4] The Agreement, which is governed by North Carolina law (Compl. ¶¶ 66, 92; Ex. A at 11[5]), sets forth the terms applicable to the credit card,

---

[3] References to "Exs." A-F are to the exhibits to Michael Watkins's January 12, 2026 declaration and "Exs." E1 and F1 are to the exhibits to Danielle Morris's January 12, 2026 Declaration.

[4] "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

[5] Citations to exhibit pages refer to the page number of the PDF document, not the page number on the face of the document.

3

including how billing cycles operate, how and when interest is calculated, and how payments are processed. The Agreement also defines key terms the Bank uses with its customers.

Among other things, the Agreement explains that the Bank's credit cards operate on billing cycles, which are a set time period (typically a month) that "ends on a Statement Closing Date (or Closing Date) determined by [the Bank] and begins on the day after the Closing Date of the previous billing cycle." (Ex. A at 6.) At each billing cycle's close, the Bank sends a monthly statement with information regarding the customer's transactions that month, the minimum payment (the "Total Minimum Payment Due"), the total balance as of the Closing Date, and the payment due date. (*See id.* at 6–7.) Each monthly statement reflects a single billing cycle. (*Id.* at 6.) Under the Agreement, the payment due date "will be at least 25 days from [the] statement Closing Date and will fall on the same calendar date each month." (*Id.* at 7.)

Billing cycles are critical to administering credit card accounts because customers must pay the minimum amount due each month, which is calculated as of billing cycle close. (*Id.* at 8.) The Agreement also provides an interest grace period under which customers are not charged interest on their purchases if they pay off the "New Balance Total" every billing cycle. (Compl. ¶ 28; Ex. A at 6–7.) The Agreement makes clear that "New Balance Total" is billing-cycle specific and defines it by reference to the payment amount in the customer's monthly statement: "New Balance Total (also referred to as the '*Statement Balance*') is the total billed amount as of the Closing Date of a billing cycle, as shown *on your monthly statement*." (Ex. A at 7.)[6]

While the Bank calculates minimum payments and New Balance Totals on a billing-cycle basis, it permits customers to make payments at any time. (Compl. ¶ 23.) The Agreement

---

[6] Unless otherwise noted, all emphasis is added, and all internal citations and quotation marks are omitted.

provides that "[p]ayments are allocated to posted balances," and recognizes that overpayments or credits may, "if there are no other balances on the account, [] create a credit balance." (Ex. A at 9.) The Agreement also advises customers that "[i]f you overpay or if there is a credit balance on your account, we will not pay interest on such amounts." (*Id.* at 8.)

## II.     THE BANK'S AUTOMATIC PAYMENT SERVICE

The Bank offers its customers the option to automate their monthly credit card payments, by enrolling in automatic payment arrangements. (*Id.*) To do so, customers must first enroll in the Bank's online banking services and agree to the Bank's Online Banking Service Agreement ("Online Banking Agreement"), which governs online and automatic payments. (Ex. C.) Customers enrolling in automatic payments can select (i) the amount that will be paid and (ii) the date on which the payment will be made. (Compl. ¶ 27.) For the payment amount, customers have two options: (i) "Minimum Payment," which refers to the Total Minimum Payment Due that the Agreement requires to be paid each month, or (ii) "Statement Balance." (*Id.* ¶ 28.) The Agreement expressly reminds customers that "Statement Balance" for purposes of automatic payment "is the same term as 'New Balance Total' as it is used in the Agreement." (Ex. A at 8 ("You may set up automatic payment arrangements . . . . Where these arrangements refer to 'Statement Balance' remember that is the same term as 'New Balance Total' as it is used in the Agreement.").) In addition, the Complaint alleges that when customers select their automatic payment options, the Bank informs them that "'Statement Balance' means the 'New Balance Total, *as shown on the credit card statement . . . .*'" (Compl. ¶ 28.)

For customers enrolled in automatic payments, when a statement is issued, the Bank schedules an electronic payment from the customer's linked bank account, in the amount the customer selected—i.e., either Minimum Payment or Statement Balance as reflected in the customer's most recent monthly statement—for the customer-selected date. (*See id.* ¶¶ 27–28.)

For example, if a customer's July 1, 2025–July 31, 2025 monthly statement reflected a Statement Balance of $1,500, a Minimum Payment of $250, and a payment due date of August 26, and the customer set up automatic payment of the Statement Balance on the payment due date, the Bank would schedule a $1,500 payment to be made on August 26, 2025. Once an automatic payment is scheduled, it is reflected and visible to the customer online and through the customer's mobile device. (*See id.* ¶ 46.) The Online Banking Agreement provides that scheduled payments "can be canceled prior to 5 p.m. ET on the third bank business day prior to the scheduled delivery date" and that "[o]nce a payment has begun processing, it cannot be canceled." (Ex. C at 9; *see also* Ex. A at 12 ("You must contact us . . . [a]t least 3 business days before an automated payment is scheduled, if you want to stop payment.").)

## III. SDOUCOS'S AUTOMATIC PAYMENT

Sdoucos alleges that he set up automatic payments to pay his Statement Balance one day before the payment due date, to "avoid paying interest charges and [late] fees" and carrying a balance from month-to-month. (Compl. ¶¶ 37–39, 41.) During the September/October Billing Cycle, Sdoucos made $3,044.88 in purchases and one manual payment of $1,000 on October 10, 2025. (*Id.* ¶ 42; Ex. D (incorporated into Compl. ¶ 42) at 4.) These transactions resulted in a $2,044.88 balance when the September/October Billing Cycle closed on October 13, 2025. (*Id.*) Sdoucos's monthly statement thus showed a Statement Balance of $2,044.88 and a payment due date of November 10, 2025. (Ex. D.) Consistent with Sdoucos's automatic payment selections, the Bank scheduled an automatic payment of $2,044.88 to post on November 10, 2025. (Compl. ¶ 46.)[7]

---

[7] While Plaintiff set up automatic payments to be paid one day before the payment due date (November 9, 2025) (Compl. ¶ 41), the payment posted on November 10, 2025 because November 9, 2025 was a Sunday.

On October 21, 2025—after the September/October Billing Cycle closed on October 13, 2025, and the statement was issued—Sdoucos made a manual payment of $2,044.88, which, consistent with the Agreement, the Bank applied to Sdoucos's posted balance. (*Id.* ¶ 43.) Because Sdoucos had not yet made any purchases, incurred any other charges or fees, or made other payments on his card since the September/October Billing Cycle had closed on October 13, the manual payment reduced Sdoucos's balance to zero. (*Id.* ¶¶ 44–45.).

Sdoucos alleges that on Sunday, November 9, 2025, he logged into his online credit card account and "noticed" that the Bank had done exactly what he had instructed it to do—schedule an automatic payment of $2,044.88 (the New Balance Total as shown in his statement) to be made on Monday, November 10, 2025. (*Id.* ¶ 46.) Sdoucos further alleges that he called the Bank that day and spoke to a customer service representative who confirmed that the Bank had in fact scheduled a $2,044.88 automatic payment to be made the next day. (*Id.* ¶ 47.) Because the automatic payment was being processed and it was less than three business days before the scheduled payment date, per the Agreement, the representative confirmed that Sdoucos could not cancel the automatic payment but could request a refund, after that payment posted. (*Id.* ¶ 49.)

Conspicuously omitted from the Complaint (but reflected in the recordings of Sdoucos's November 9, 2025 call, which the Court may consider on this motion),[8] is that the customer service manager offered to process a refund of the October 21, 2025 manual payment:

---

[8] The Court may consider the recordings of Sdoucos's November 9, 2025 call under both Rules 12(b)(1) and 12(b)(6) because the Complaint selectively incorporates the contents of Sdoucos's conversation with the Bank's customer service representative (Compl. ¶¶ 47–49), while omitting key aspects of the conversation that show he has no claim. *See Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024) (holding that on a motion to dismiss, the court may consider "an exhibit, including a video exhibit, [that] incontrovertibly contradicts the allegations in the complaint"). In addition, for purposes of the Bank's motion to dismiss under 12(b)(1) for lack of standing, "the court may consider and weigh evidence outside the pleadings." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020).

> The payment that has already posted on the 21st, I can refund that back to you, and then you can just allow the one that's pending to post, because the one that's pending is not eligible for a refund yet because it hasn't processed. But today is Sunday, so the one that's pending, it'll post sometime tomorrow, right in time for the due date, but the one that's already posted, I can send that back to your checking account for you.

(Ex. F1 at 4:13–19.) Sdoucos, however, voluntarily and explicitly refused this solution which would have entirely avoided the injury alleged in his complaint. (*Id.* at 4:20–22.) The customer service manager then explained to Sdoucos that nothing could be done that day regarding the future scheduled automatic payment because "the payment [was] pending," but that "when it posts to the account, you're going to have a credit of $2,044.88," and can request an expedited refund to get the funds in one to three business days. (*Id.* at 5:4–8, 5:16–23, 8:3–7.). The Bank disclosed, and Sdoucos agreed, in the Online Banking Agreement that an automatic payment could not be cancelled while it was pending. (*See* Ex. C at 9.)

On November 10, 2025, the automatic payment posted as scheduled, and the Bank applied the payment to Sdoucos's posted balance per the Agreement, resulting in a $2,044.88 credit. (Compl. ¶ 50.) Plaintiff does not allege that he ever requested a refund for the credit. The day after the scheduled automatic payment posted and only two days after allegedly first noticing that scheduled automatic payment and contacting the Bank, Sdoucos filed a 109-paragraph, four-count class-action complaint.

## ARGUMENT

I. **THE COMPLAINT MUST BE DISMISSED UNDER RULE 12(B)(1) BECAUSE SDOUCOS LACKS STANDING.**

"If the plaintiff lacks standing, the federal court lacks subject matter jurisdiction and the suit must be dismissed under [FRCP] 12(b)(1)." *Int'l Union of Operating Eng'rs, Loc. 139, AFL-CIO v. Daley*, 983 F.3d 287, 294 (7th Cir. 2020). "[P]laintiff bears the burden of establishing the elements of Article III standing." *In re Recalled Abbott Infant Formula Prods.*

*Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024). If the "allegations supporting standing are questioned as a factual matter . . . , the plaintiff must support each controverted element of standing with 'competent proof.'" *Bazile*, 983 F.3d at 278.

Only plaintiffs who "claim to have suffered an injury that the defendant caused and the court can remedy" have standing. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 461 (7th Cir. 2020); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("To establish standing, . . ., a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief.").

A "self-inflicted" injury is not traceable to the defendant's conduct and thus does not confer standing. *See Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 517–18 (7th Cir. 2010); *see also Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("The injuries to the plaintiffs' fiscs were self-inflicted . . . . No [plaintiff] can be heard to complain about damage inflicted by its own hand."); *Petro-Chem Processing, Inc. v. E.P.A.,* 866 F.2d 433, 438 (D.C. Cir. 1989) ("[T]o the extent that this injury is self-inflicted, it is so completely due to the complainant's own fault as to break the causal chain.").

Here, Sdoucos lacks standing because the injury he claims to have suffered—"undue financial hardship" from the loss of funds "earmarked for other family expenses" (Compl. ¶ 52)—is entirely of his own creation. When Sdoucos contacted the Bank on November 9, 2025 (the day before the scheduled automatic payment posted), the Bank offered him a solution (to the problem of his own making) that would have prevented his alleged injury: processing a refund of the already-posted October 21, 2025 manual payment. (*See supra* at 7–8.) This would have restored the $2,044.88 to Sdoucos's account and given him use of the funds. But Sdoucos

9

rejected this refund (along with the Bank's suggestion that if he did not want the manual payment refunded, he should call after the automatic payment posted and request an expedited refund of the credit balance). (*See supra* at 8.) Sdoucos's alleged injury was caused by a combination of his decision to make a manual payment without cancelling the scheduled automatic payment he instructed the Bank to make, and his rejection of the offered refund. He therefore lacks standing to bring these claims. *See Bui v. Zuru LLC*, 2024 WL 5680719, at *5 (C.D. Cal. Aug. 8, 2024) ("[W]hen a defendant offers a plaintiff a full refund of her alleged losses prior to the commencement of litigation, the refund deprives the plaintiff of Article III standing because she cannot establish injury in fact.").

## II. THE COMPLAINT SHOULD BE DISMISSED UNDER 12(B)(6) FOR FAILURE TO STATE A CLAIM.

To survive dismissal under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025). Plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Orr v. Shicker*, 147 F.4th 734, 741 (7th Cir. 2025). Although the Court "accept[s] the well-pleaded facts in the complaint as true," it does not accept "legal conclusions and conclusory allegations." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

### A. The Complaint Does Not Plead a NCUDTPA or NCDCA Violation.

To plead a claim under either NCUDTPA or NCDCA, Sdoucos "must allege (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff."[9] *Carpenter v. William Douglas Mgmt., Inc*., 132 F.4th 280, 287 (4th Cir.

---

[9] In addition to the requirements above, a NCDCA action also requires Plaintiff to plead (and ultimately prove), as a threshold requirement, that "(1) the obligation owed is a 'debt'; (2) the one owing the obligation is a 'consumer'; and (3) the one trying to collect the obligation is a

2025) (NCUDTPA); *Waddell v. U.S. Bank Nat'l Ass'n*, 395 F. Supp. 3d 676, 682 (E.D.N.C. 2019) (NCDCA). Sdoucos's NCUDTPA (Count I) and NCDCA (Count II) claims must be dismissed because the Complaint does not plead an unfair or deceptive act or that such act proximately caused Sdoucos's alleged injury.

Sdoucos's NCUDTPA and NCDCA claims fail because he does not plausibly allege that the Bank engaged in an unfair or deceptive act or practice. "A practice is unfair when it offends established public policy" or "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Carpenter*, 132 F.4th at 287. A practice "is deceptive if it has a tendency to deceive." *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001). "Although it may seem obvious, a party's actions that conform with the terms of a contract have not been considered an unfair trade practice." *Gay v. Peoples Bank*, 2015 WL 3650090, at *11 (N.C. Super. Ct. June 10, 2015) *aff'd*, 2016 WL 1743355 (N.C. Ct. App. May 3, 2016) (holding overdraft fees based on transaction posting order not unfair or deceptive where posting order conformed with account agreement); *see also Gaynoe v. First Union Corp*., 571 S.E.2d 24, 27 (N.C. Ct. App. 2002) (affirming dismissal of NCUDTPA claim "[s]ince we have concluded that defendants acted in accordance with the cardholder agreement"). Similarly, where a financial institution complies with website disclosures, the conduct has been found not to be unfair or deceptive. *See Manos v. Freedom Mortg. Corp.*, 2022 WL 874181, at *2–3 (4th Cir. Mar. 24,

---

'debt collector.'" *Williams v. Pegasus Residential, LLC*, 2019 WL 4305989, at *2 (M.D.N.C. Sept. 11, 2019). If that is the case, "the NCDCA provides a claimant's exclusive remedy," *DIRECTV, Inc. v. Cephas*, 294 F. Supp. 2d 760, 765 (M.D.N.C. 2003), and Plaintiff cannot pursue a claim for both NCDCA and NCUDTPA. *See Waddell v. U.S. Bank Nat'l Ass'n*, 395 F. Supp. 3d 676, 685 (E.D.N.C. July 29, 2019) ("[T]he NCDCA supplants the UDTPA in the debt collection context."). While the Court should dismiss both claims here, North Carolina law is clear that they cannot proceed simultaneously.

11

2022) (practice of treating payments submitted after 11:00 p.m. as posted the following day not deceptive, where website banner notified customers of practice).

Sdoucos's theory is that the Bank engaged in unfair and deceptive acts by proceeding with an automatic payment in the amount of the Statement Balance, rather than modifying the automatic payment to reflect a manual payment made after the billing cycle closed but before the scheduled payment. (*See* Compl. ¶¶ 69–72.) But this cannot be unfair or deceptive as a matter of law because the Bank did precisely what it told Sdoucos it would. The Complaint concedes that when Sdoucos instructed the Bank to automatically pay his "Statement Balance," the Bank's website informed him that "Statement Balance" meant "the 'New Balance Total, as shown on the credit card statement." (*Id.* ¶ 28.) The Complaint further concedes that Sdoucos "intend[ed] to cause Bank of America to withdraw the New Balance Total owed each month on or before its due date." (*Id.* ¶ 39.) These concessions are consistent with the Agreement, which informed Sdoucos and all other Bank customers that "Statement Balance" for automatic payment purposes means the "total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement." (Ex. A at 7; *see also* Compl. ¶ 96 ("The phrase 'statement balance' implies that Bank of America will withdraw the full amount owed on the credit card pursuant to its customer's instructions.").) The Bank thus told Sdoucos that the amount he was instructing the Bank to pay automatically was fixed as of a moment in time—the Closing Date of the billing cycle shown on the monthly statement—and would not change after that date. It is self-evident that manual payments that a customer makes (or any other transaction that occurs) after the billing cycle closes and the statement is issued cannot change the balance shown on the *already issued* statement. Sdoucos's assertion that he thought the Bank continuously would adjust the automatic payment to reflect manual payments made *after* the Closing Date and not shown on

12

the statement cannot be reconciled with the Bank's Agreement or disclosures. To the extent that Sdoucos relied on an "understanding" that the automatic payment amount would be dynamic and reflect manual payments made after the Closing Date and not shown in the statement, this is directly contrary to how the Agreement defines "New Balance Total." Under North Carolina law, such reliance "is unreasonable as a matter of law" because it is "directly contrary to the express terms of a written contract." *See Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 411–12 (E.D.N.C. 2015).

Here, the Complaint concedes that the statement for the September/October Billing Cycle showed a New Balance Total of $2,044.88, and that the Bank processed an automatic payment for $2,044.88 on November 10, 2025. The Bank doing precisely what Sdoucos instructed it to do and what it said it would do in the Agreement is not unfair or deceptive. *JTG Equip. & Supply, LLC v. EBay, Inc.*, 2015 WL 303589, at *7 (N.C. Super. Jan. 23, 2015) (dismissing NCUDTPA claim where defendant acted in accordance with user agreement's express terms); *see also Rider v. Aderhold*, 2013 WL 3776961, at *4 (N.C. Ct. App. July 16, 2013) ("A bank exercising its rights under a loan agreement does not engage in a deceptive or unfair practice.").

Sdoucos's NCUDTPA and NCDCA claims also should be dismissed because Sdoucos fails to plead an injury proximately caused by the Bank's alleged misconduct, for the reasons discussed in Section I, *supra*. *Pope v. TT of Lake Norman, LLC*, 505 F. Supp. 2d 309, 313 (W.D.N.C. 2007) (dismissing for failure to plead an injury proximately caused by the allegedly unfair or deceptive conduct).

## B. Sdoucos Has Not Pleaded an Implied Covenant Claim.

The implied covenant cannot be used to create obligations that the parties could have but did not bargain for and cannot be used to impose on a party to a contract, obligations that are not within the scope of the express terms of that contract. *See, e.g.*, *Rich Food Servs., Inc. v. Rich*

13

*Plan Corp.*, 98 F. App'x 206, 211 (4th Cir. 2004) (holding implied covenant cannot supply duty that "would conflict with the express contractual terms"); *Liris S.A. v. Morris & Assocs., Inc.*, 496 F. Supp. 3d 931, 942 (E.D.N.C. 2020) (Implied covenant "is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise."). But that is precisely what Sdoucos seeks to do here by arguing that the Court should imply and impose a new obligation into the Agreement requiring the Bank to continuously update the automatic payment amount to reflect post-statement manual payments, even though that is not what it provides.

*First*, the Agreement could have expressly provided for such an obligation but did not. The Complaint specifically alleges other financial institutions provide for "dynamic automatic payment features." (Compl. ¶¶ 31–34.) The decision not to expressly include this obligation weighs strongly against implying such an obligation. *VRX USA, LLC v. VRX Ventures, Ltd.*, 2020 WL 7229672, at *6 (W.D.N.C. Dec. 8, 2020) (Parties cannot "use the implied covenant . . . to write new obligations … that do not exist in the written agreement.").

*Second*, as explained above (*see supra* at 4), the Agreement clearly states that for purposes of automatic payments, "Statement Balance" would be a fixed amount—i.e., the "total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement." Implying an obligation for the Bank to adjust for payments that were not shown in the monthly statement would contradict the Agreement's express terms, which North Carolina law does not permit. *Hancock v. Americo Fin. Life & Annuity Ins. Co.*, 378 F. Supp. 3d 413, 431 (E.D.N.C. 2019) ("[A]sserted implied term cannot be used to contradict the express terms of a contract.").

*Third,* the Agreement's requirement to allocate payments to posted balances does not justify rewriting the Agreement. The Bank complied with this express requirement when it

applied the scheduled automatic payment to reduce Sdoucos's posted balance from zero to a $2,044.88 credit. (Compl. ¶ 50.) Indeed, the Agreement expressly recognizes and disclosed to Plaintiff that reducing the posted balance could create a credit balance, (Ex. A at 9), which happened here.

### C. The Agreement Bars Sdoucos's Unjust Enrichment Claim.

North Carolina law precludes actions for unjust enrichment where the conduct is governed by an express contract. *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988) ("A claim of [unjust enrichment] is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law.... If there is a contract between the parties the contract governs the claim and the law will not imply a contract."). Here, the Agreement governs the terms of Sdoucos's credit card, including how payments will be processed. (*See* Compl. ¶¶ 39, 66.) The Agreement's existence thus requires dismissal of the unjust enrichment claim. *Wireless Commc'ns, Inc. v. Epicor Software Corp.*, 2011 WL 90238, at *7 (W.D.N.C. Jan. 11, 2011) (dismissing unjust enrichment claim "given the existence of an actual contract"); *see also Cross v. Ciox Health, LLC*, 438 F. Supp. 3d 572, 589 (E.D.N.C. 2020) (dismissing because contract governed payment obligation).

### CONCLUSION

For the reasons stated above, Sdoucos's claims must be dismissed under 12(b)(1) for lack of standing or alternatively, under 12(b)(6) for failure to state a claim.

Dated: January 12, 2026

Respectfully submitted,

By: */s/ Elizabeth L. McKeen*

Elizabeth L. McKeen (CA Bar No. 216690)
Danielle N. Morris (CA Bar No. 246295)
O'MELVENY & MYERS LLP
610 Newport Center Drive
17th Floor
Newport Beach, California 92660-6429
Telephone:  +1 949 823 6900
Facsimile:   +1 949 823 6994
emckeen@omm.com
dmorris@omm.com

Attorneys for Defendant Bank of America, N.A.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2026, a copy of the foregoing document was electronically filed with the Clerk of Court through the CM/ECF system, which will send notification of such filing to all counsel of record at the email addresses on file with the Court.

By:  */s/ Elizabeth L. McKeen*
Elizabeth L. McKeen

17