IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS SDOUCOS, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 25 C 13845 |
| v. | ) ) | Judge Robert W. Gettleman |
| BANK OF AMERICA, N.A., | ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Nicholas Sdoucos has sued defendant Bank of America on behalf of himself and a putative class of similarly situated people under the Class Action Fairness Act, 28 U.S.C. § 1332(d), alleging that defendant wrongfully withdrew funds to pay off credit card balances that had already been manually paid. According to plaintiff, he has a Mastercard through defendant, for which he "authorize[d] automatic payments" to be made from his Charles Schwab bank account to cover "the full balance owed so that the card is paid in full each month and no balance carries over." During a pay cycle in October 2025, plaintiff decided to manually pay the $2,044.88 total balance on his credit card account 20 days before the payment due date. But when he logged into his credit card account 19 days later, he "noticed that a payment in the amount of $2,044.88 was scheduled to automatically [debit the next day] from his bank account"—even though he had a zero balance.

Concerned, he called defendant but was told that there was no way to cancel the auto debit, and that he would have to wait for the money to be withdrawn and then request a refund. The next day, defendant debited $2,044.88 from his Schwab account, which is now a credit on

plaintiff's credit card account.   A day later, plaintiff filed this lawsuit on behalf of himself and the class, asserting four counts: a claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1, et seq. (Count I); a claim "in the alternative" under North Carolina Debt Collection Act ("NCDCA"), N.C. Gen. Stat. § 75-50, et seq. (Count II); a claim for breach of the implied covenant of good faith and fair dealing (Count III); and a claim for unjust enrichment (Count IV).

Defendant has moved to dismiss all counts under Fed. R. Civ. P. 12(b)(1) for lack of standing, and under Rule 12(b)(6) for failure to state a claim.   Plaintiff opposes.   For the reasons below, the court grants in part and denies in part defendant's motion.

### BACKGROUND

Plaintiff alleges that following facts.   Defendant is a North Carolina corporation (with a principal place of business in North Carolina) that provides credit and banking services. Defendant's credit cardholders can access their accounts online, where they can see, among other things, their balance, the payment due date, and the minimum amount due.   At any point in the billing cycle, cardholders "may pay anywhere from the minimum payment set forth in [their] monthly statement up to the full statement balance."   And the "cardholder agreement provides that card holders may pay the entire amount owed . . . at any time."

Cardholders can also set up automatic payments whereby defendant "can withdraw their chosen payment amount each month on a designated payment date."   To that end, cardholders may elect automatic payments for either the "Minimum Payment" or the "Statement Balance." According to defendant, "Statement Balance" means: the "'New Balance Total, as shown on the credit card statement.   This option will pay your statement in full.   We will not charge you

2

interest on purchases if you always pay your entire New Balance Total by the Payment Due Date each month. This is not a payoff amount.'" Because defendant "promises that 'This option will pay your statement in full,' reasonable consumers understand this option to mean that it is intended to pay off the statement in full."

It turns out, though, that this is misleading: defendant does not disclose that if cardholders "set up automatic payments using the 'Statement Balance' option, [defendant] will automatically debit their account for the amount of the 'New Balance Total' *even if* the customer has already paid all or part of that amount earlier in the month." (Emphasis in Complaint). This practice of "double-debiting" accounts is "deceptive, unfair, and out of step with industry norms." Indeed, cardholders "have no way to anticipate that" or prevent defendant from overbilling because defendant "does not warn them of its practice until it has already taken their money." What's more, defendant "profits from retaining this money that it snatches from customers' accounts without notice or warning, refuses to pay interest on the amounts wrongfully taken, and requires consumers to navigate unreasonable hurdles to obtain refunds."

Plaintiff resides in Illinois, and opened a Mastercard through defendant in 2017. He "chose to connect his credit card to his" Schwab account "and authorize automatic payments of the full balance owed," with the auto payments to be paid one day before the payment due date. His statement for the September 14 - October 13, 2025 period showed that he used his "credit card to pay for $3,044.88 in goods and services and remitted one payment for $1,000.00, leaving a balance of $2,044.88 on October 13, 2025." But he decided to pay the balance sooner and not wait for the auto debit. So "[o]n October 21, 2025, [20] days before the payment due date, [he] logged into his . . . account and manually submitted a payment for $2,044.88, which was the total

3

balance owed." (Emphasis removed). Based on defendant's website, his credit card statement should have reflected a zero balance by October 23, 2025—18 days before his due date.

But when plaintiff later logged into his credit card account on November 9, 2025, he saw that a $2,044.88 payment was still scheduled to automatically debit the next day (November 10)—despite having a zero balance. So he "immediately phoned" defendant. Defendant's representative "confirmed that: (1) the autopayment was set up to pay any outstanding balance on the account as of the payment due date and (2) there was, in fact, a zero balance on his account and the balance had been zero since October 21, 2025." When plaintiff asked why defendant was going to debit funds on a zero-balance account, the representative "explained that [defendant] recently implemented new software which was not recognizing manual payments and that [the representative] had been fielding calls from many [of defendant's] customers who were experiencing the same issue."

Plaintiff then asked if there was a way to cancel the auto debit scheduled for November 10, 2025. But the representative told him that there was nothing he could do to stop the payment, and "that [plaintiff] would have wait for the money to be withdrawn, and then request a refund." The next day, on November 10, 2025, defendant debited $2,044.88 from his Schwab account, "which is now represented as a credit on" his credit card account.

Plaintiff "reasonably believed that he had authorized [defendant] to automatically pay any balance owed on his statement"—not to "withdraw funds in excess of any balance owed." Defendant has caused him "undue financial hardship by debiting funds to which it was not entitled, and which were earmarked for other family expenses," and defendant "has benefited from the use of [his] money in the meantime."

4

As a result, plaintiff filed his complaint here on November 11, 2025, asserting four state-law counts on behalf himself individually, and a class of similarly situated consumers including: "all persons (1) with a Bank of America credit card (2) who enabled automatic payments through the Bank of America website, (3) selected the 'statement balance' payment option, (4) made a mid-cycle payment, and (5) were still billed the full 'New Balance Total' during the applicable statutes of limitations through the date a class is certified." He ultimately seeks monetary and equitable relief.

## DISCUSSION

Defendant moves to dismiss the complaint under Rules 12(b)(1) and 12(b)(6). The court addresses each ground in turn.

### Motion to Dismiss under Rule 12(b)(1)

#### The Doctrine of Standing

Defendant first argues that the complaint must be dismissed under Rule 12(b)(1) because plaintiff lacks standing. "Rule 12(b)(1) is the means by which a defendant raises a defense that the court lacks subject-matter jurisdiction." Bazile v. Fin. Sys. of Green Bay, Inc., 983 F.3d 274, 279 (7th Cir. 2020) (citing Fed. R. Civ. P. 12(b)(1)). An "essential ingredient of subject-matter jurisdiction" is "standing." Id. at 278

Indeed, "[i]t is a fundamental precept that federal courts are courts of limited jurisdiction." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978). Article III of the Constitution, for example, "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). To "ensure that federal courts do not exceed their authority" to adjudicate only cases or controversies, the

5

Supreme Court developed the doctrine of standing. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).

At bottom, the standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id. It does so by requiring plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." TransUnion, 594 U.S. at 423 (cleaned up).

Whether Defendant's Challenge is Facial or Factual

A no-standing defense asserted under Rule 12(b)(1) "can take the form of a facial or a factual attack on the plaintiff's allegations." Bazile, 983 F.3d at 279. Because there are differences between the two, "the court must first determine whether a factual or facial challenge has been raised." Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir. 2015). "A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist"; it does not test "the alleged facts themselves." Bazile, 983 F.3d at 279. "In the context of facial challenges, . . . the court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 444 (7th Cir. 2009).

A factual attack, on the other hand, does test "the existence of jurisdictional facts underlying the allegations." Bazile, 983 F.3d at 279. So in the context of factual challenges, "the court may consider and weigh evidence outside the pleadings to determine whether it has

6

power to adjudicate the action." Id. A factual challenge generally "requires that a movant proffer conflicting evidence." Nater v. State Farm Mut. Auto. Ins. Co., No. 23-CV-1408-JES, 2024 WL 2155249, at *3 (C.D. Ill. May 14, 2024). "Once the allegations supporting standing are questioned as a factual matter—either by a party or by the court—the plaintiff must support each controverted element of standing with competent proof," which requires "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." Bazile, 983 F.3d at 278 (cleaned up).

Here, defendant does not expressly assert whether its challenge is facial or factual, but it suggests that it is factual. In particular, as further explained below, defendant's standing argument relies on material that was not attached to the complaint—a recording and transcript of plaintiff's November 9, 2025 call with defendant's representatives (specifically, a portion of that call, which is not discussed in the complaint). And to support looking at that material, defendant cites Bazile for the proposition that the "court may consider and weigh evidence outside the pleadings" to resolve a factual challenge, and that "[i]f the 'allegations supporting standing are questioned as a factual matter . . . , the plaintiff must support each controverted element of standing with 'competent proof.'"" (Quoting Bazile, 983 F.3d at 278-79). For his part, plaintiff does not mention the type of challenge at issue, or contest plaintiff's reliance on the recording and transcript; he in fact relies on that material himself.

The court is thus "inclined to conclude that" defendant raises a factual challenge. Nater, 2024 WL 2155249, at *3 (considering State Farm's Rule 12(b)(1) motion as a factual challenge because "State Farm . . . provided several exhibits in support of its Rule 12(b)(1) argument" and "cite[d] the legal standard for evaluating a Rule 12(b)(1) motion that raises a factual challenge to

7

a complaint"). The court therefore may consider the recording and transcript in determining if subject matter jurisdiction exists.[1]

<u>Whether Plaintiff has Standing</u>

Turning to the parties' arguments, defendant contends that plaintiff lacks standing because a "'self-inflicted' injury is not traceable to the defendant's conduct and thus does not confer standing," (citing <u>Parvati Corp. v. City of Oak Forest</u>, 630 F.3d 512, 517-18 (7th Cir. 2010)), and here, "the injury he claims to have suffered—'undue financial hardship' from the loss of funds 'earmarked for other family expenses'—is entirely of his own creation." (Cleaned up). Defendant asserts that "[c]onspicuously omitted from the Complaint (but reflected in the recordings of [plaintiff]'s November 9, 2025 call . . .), is that the customer service manager offered to process a refund of the October 21, 2025 manual payment." By so doing, defendant argues, defendant's representative "offered [plaintiff] a solution . . . that would have prevented his alleged injury." Yet plaintiff "rejected this refund (along with the Bank's suggestion that if he did not want the manual payment refunded, he should call after the automatic payment posted and request an expedited refund of the credit balance)." According to defendant, "accepting this offer would have restored the $2,044.88 to his account and given him use of the funds." So, defendant concludes, plaintiff lacks standing because his "injury was caused by a combination of

---

[1] The recording is also arguably incorporated into the complaint. Defendant contends as much: "The Court may consider the recordings of [plaintiff]'s November 9, 2025 call under both Rules 12(b)(1) and 12(b)(6) because the Complaint selectively incorporates the contents of [plaintiff]'s conversation with [defendant]'s customer service representative (Compl. ¶¶ 47–49), while omitting key aspects of the conversation that show he has no claim." (Citing <u>Esco v. City of Chi.</u>, 107 F.4th 673, 679 (7th Cir. 2024)). This potentially keeps the standing challenge a facial challenge. But ultimately, the distinction is not material in resolving this particular dispute, which turns on a legal issue related to the traceability element of standing.

8

his decision to make a manual payment without cancelling the scheduled automatic payment he instructed the Bank to make, and his rejection of the offered refund."

In response, plaintiff contends that defendant "created the need for any refund at all by debiting funds from [his] account despite knowing that he fully paid off the balance." And, plaintiff asserts, "loss of access to money is a concrete injury, even when access is eventually restored." What is more, plaintiff argues, defendant's "offer to let [him] request a refund of the funds [defendant] wrongfully took [also] does not eliminate standing," because "[i]t is well settled that plaintiffs may opt for trial even in the face of more concrete offers and 'could even reject . . . an offer to pay the entire claim before a suit was filed . . . .'" (Quoting Laurens v. Volvo Cars of N. Am., LLC, 868 F.3d 622, 628 (7th Cir. 2017)).

In reply, defendant again presses that if plaintiff had accepted the offer for the manual-payment refund, he "would have prevented the very credit balance and the associated loss of use of funds that he claims is his injury." And defendant again notes that it "also offered [him] an expedited refund after the automatic payment finished processing." So, defendant concludes, any harm plaintiff suffered "is because he voluntarily chose to make a manual payment without cancelling his already scheduled automatic payment and then rejected the two solutions that [defendant] offered to fix the problem he created." Plaintiff thus has no standing.

Although the issue is close (and the alleged facts are unlikely to be common to the putative class), the court finds that plaintiff has standing. As for injury in fact, a plaintiff must show that he has suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, 578 U.S. at 339 (cleaned up). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and

9

individual way." Id. (cleaned up). To be concrete, it generally should have "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." TransUnion, 594 U.S. at 425 (cleaned up). Both tangible harms (like monetary harms) and intangible harms (like reputational harms) may qualify. Id.

Plaintiff alleges here that he was injured when defendant withdrew funds from his Schwab account even though he had already paid off the full balance and therefore did not owe any money. This, according to the complaint, caused him "undue financial hardship by debiting funds to which [defendant] was not entitled, and which were earmarked for other family expenses." Defendant does not dispute that its autopayment system withdrew funds from plaintiff, or that those funds have not been returned. Nor does it meaningfully dispute that the loss of use of funds can constitute an injury. That is unsurprising: the Seventh Circuit recognizes that plaintiffs can suffer an injury when a bank makes an unauthorized withdrawal at least "because unauthorized withdrawals from their accounts cause a loss (the time value of money) even when banks later restore the principal, and because the value of one's own time needed to set things straight is a loss from an opportunity-cost perspective." Dieffenbach v. Barnes & Noble, Inc., 887 F.3d 826, 828 (7th Cir. 2018); see also Habitat Educ. Ctr. v. U.S. Forest Serv., 607 F.3d 453, 457 (7th Cir. 2010) ("Every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money.").

Unable to dispute this, defendant argues that plaintiff could have accepted—but rejected—an offer to "call after the automatic payment posted and request an expedited refund of the credit balance." But this argument fails for two reasons. For one thing, accepting the offer would not have erased the lost "opportunity-cost" of "one's own time needed to set things

10

straight." Dieffenbach, 887 F.3d at 828. For another, "[a]n unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect"; "the recipient's rejection of an offer leaves the matter as if no offer had ever been made." Campbell–Ewald Co. v. Gomez, 577 U.S. 153, 162 (2016) (cleaned up). And so "a mere offer does not strip the court of jurisdiction." Laurens, 868 F.3d at 628 (cleaned up). In fact, a plaintiff can "even reject tender, which [is] an offer to pay the entire claim before a suit [is] filed, accompanied by actually produc[ing] the sum at the time of tender in an unconditional manner." Id. (cleaned up). Because plaintiff did not accept defendant's offer (such as it was) to seek a refund after the autopayment, his "injury-in-fact . . . remains unredressed." Id. at 629; see id. at 627-29 (rejecting argument that an unaccepted offer for a refund made before a plaintiff sues (or is joined to an existing lawsuit) strips the plaintiff of standing). Plaintiff has therefore shown an injury in fact.

As for the fairly traceable element, it "examines the causal connection between the assertedly unlawful conduct and the alleged injury." Taylor v. Salvation Army Nat'l Corp., 110 F.4th 1017, 1025 (7th Cir. 2024). "[I]f the causal chain" between the plaintiff's injury and the defendant's conduct is "attenuated," the injury will not be "fairly traceable to a defendant's conduct." Id. (cleaned up). But if there is "a meaningful connection between the two," Article III will be met. Id. (cleaned up). Under this standard, then, the "defendant's conduct" need not have been "the most immediate cause, or even a proximate cause, of [the plaintiff's] injuries." Id.

Here, plaintiff's injury is fairly traceable to defendant. Indeed, but for defendant's wrongful automatic withdrawal of funds from plaintiff's bank account, plaintiff would not have

11

lost access to his money on January 10, 2025. His injury thus was meaningfully connected to the defendant's conduct.

Defendant attempts to avoid this conclusion by placing plaintiff's own actions in front of defendant's wrongful auto withdrawal. As noted above, defendant cites the 2010 Parvati case to contend that plaintiff's injury was "self-inflicted" and therefore not traceable to defendant, because plaintiff was the one who made a manual payment without cancelling the autopayment, and because plaintiff rejected defendant's day-before offer to refund his manual payment.

But the Supreme Court has recently rejected a similar "self-inflicted" argument. Federal Election Commission v. Cruz, 596 U.S. 289, 296 (2022). In Cruz, Senator Ted Cruz had loaned $260,000 to his reelection campaign committee. Id. at 295. But the Bipartisan Campaign Reform Act barred the committee from using more than $250,000 in post-election contributions to repay him, "leaving $10,000 of his personal loans unpaid." Id. So Cruz and his committee challenged the law under the First Amendment. Relevant here, the government contended that Cruz and the committee lacked standing to do so because the injury was not traceable to the government. The Supreme Court disagreed.

The Court explained that the committee's "present inability to repay the final $10,000 . . . constitute[d] an injury in fact to Cruz" in the form of "pocketbook harm," and to the committee because it could not discharge its obligation to repay its debt. Id. at 296. Yet the government, like defendant here, contended that this injury was "self-inflicted," and so not traceable to the government, because Cruz and the committee had admittedly delayed repaying the loan to trigger the statutory cap in order to manufacture the lawsuit, and they had also rejected a legally

12

available alternative to repay the loan in full within a 20-day post-election window. Id. at 296-98.

The Court was unconvinced. The government, the Court explained, was asking the Court to "recognize an exception to traceability for injuries that a party purposely incurs." Id. at 296. But, the Court responded, it has "never recognized a rule of this kind under Article III." Id. at 297. "To the contrary," the Court explained, it has "made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." Id.

The Court also rejected the government's assertion that it was not to blame for the injury because plaintiff had a "legally available 'alternative' that would have avoided any liability—repaying Cruz's loans in full with pre-election funds, within 20 days of the election." Id. at 298. That is because, for standing purposes, the Court had to "accept as valid the merits of [Cruz and the committee's] legal claims," and thus had to "assume that the loan-repayment limitation" was unconstitutional. Id. So, the Court explained, "[d]emanding" that the committee comply with the "alternative" would require the committee to "forgo" a "right" the Court assumes the committee had, and require the committee to "subject itself to the very framework it says" is unlawful. Id.

The Seventh Circuit has since relied on Cruz to reject another similar "self-inflicted" argument. Taylor, 110 F.4th at 1025. In Taylor, the plaintiffs were former participants in the defendant Salvation Army's "residential rehabilitation programs" for individuals in need. Id. at 1022. The plaintiffs sued the Salvation Army, alleging that it used those programs not to

13

rehabilitate but to gain forced labor that "serves only the organization's financial interests." Id. The Salvation Army moved to dismiss, arguing that the plaintiffs lacked standing "because they enrolled in the rehabilitation programs voluntarily and had the option to leave at any time." Id. at 1025. So, it asserted, "any injuries that the plaintiffs suffered were therefore 'entirely self-inflicted' and cannot support standing." Id. But the Seventh Circuit disagreed, explaining that, among other things, "there is no 'exception to traceability for injuries that a party purposely incurs.'" Id. (quoting Cruz, 596 U.S. at 296).

Like the government in Cruz and the Salvation Army in Taylor, defendant here cannot use plaintiff's own action (manually paying off his balance without cancelling the auto-debit) to break the traceability chain (which ends with defendant failing to stop its auto-debit process from withdrawing funds to which it was not entitled). And like the government in Cruz, defendant also cannot rely on its assertion that it provided an available alternative that it says would have avoided financial injury—its offer to refund the October 21 manual payment. Indeed, "[d]emanding" plaintiff to have his valid payment returned and his debt revived would force him to "subject [himself] to the very framework [he] says" is unlawful. Cruz, 596 U.S. at 298. And the offer was not accepted anyway. So, as explained above, it is a legal nullity that cannot "strip the court of jurisdiction." Laurens, 868 F.3d at 628. Consequently, plaintiff has shown traceability.

Finally, plaintiff's injury is "likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338. Indeed, courts routinely provide redress for financial harms.

In sum, plaintiff satisfies all three standing elements. As a result, the court denies defendant's motion to dismiss under Rule 12(b)(1).

14

**Dismissal Under Rule 12(b)(6)**

Defendant next moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6).   A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits.   See Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990).   To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of a claim's basis and must be facially plausible.   See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Iqbal, 556 U.S. at 678.   "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."   Id. at 679 (cleaned up).   In other words, a claim for relief "cannot be merely conceivable or speculative."   Taylor, 110 F.4th at 1028.   Rather, the "plaintiff must present a story that holds together"—with "sufficient details to make the plaintiff['s] account one that *could* have happened and, if it did happen, states a claim cognizable under the governing law."   Id. (cleaned up) (emphasis in original).

In determining whether a plaintiff has stated a facially plausible claim, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice."   Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013).   And "a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove."   Geinosky v.

15

City of Chi., 675 F.3d 743, 745 n.1 (7th Cir. 2012).   With these principles in mind, the court turns to each of the counts.

## Counts I & II

In Counts I and II, plaintiff alleges that defendant violated the NCUDTPA, N.C. Gen. Stat. § 75-1.1, et seq., and the NCDCA, N.C. Gen. Stat. § 75-50, et seq., respectively, based on defendant having debited more than was owed.[2]   Under the NCUDTPA, "'unfair or deceptive acts or practices in or affecting commerce' are unlawful."   Carpenter, trustee for H. Joe King, Jr. Revocable Tr. v. William Douglas Mgmt., Inc., 132 F.4th 280, 287 (4th Cir. 2025) (quoting N.C. Gen. Stat. § 75-1.1(a)).   To establish an NCUDTPA claim, a plaintiff must show that "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."   Manos v. Freedom Mortg. Corp., No. 21-1324, 2022 WL 874181, at *2 (4th Cir. Mar. 24, 2022) (citation omitted).

"The NCDCA prohibits debt collectors from engaging in unfair debt collection practices, including the use of threats, coercion, harassment, unreasonable publications of the consumer's debt, deceptive representations to the consumer, or other unconscionable means."   Ross v. FDIC, 625 F.3d 808, 817 (4th Cir. 2010).   "An NCDCA claim has three threshold requirements": "First, the obligation owed must be a debt; second, the one owing the obligation must be a consumer; and third, the one trying to collect the obligation must be a debt collector."

---

[2]   The parties both apply North Carolina law to all four Counts.   The court thus assumes that North Carolina law applies for purposes of resolving defendant's motion.   See Nofsinger v. Jackson Nat'l Life Ins. Co., No. 17-CV-03367, 2021 WL 3077659, at *3 (N.D. Ill. July 21, 2021) (if "the parties agree that a non-forum state's law applies, . . . the court need not conduct a choice of law analysis").

Waddell v. U.S. Bank Nat'l Ass'n, 395 F. Supp. 3d 676, 682 (E.D.N.C. 2019) (cleaned up). An NCDCA plaintiff must also meet the three NCUDTPA elements—(1) an unfair or deceptive act (2) in or affecting commerce (3) which proximately caused injury to plaintiff. Ross, 625 F.3d at 817.

Defendant argues here that Counts I and II should be dismissed because plaintiff fails to plead two of the three common elements of the two claims: that defendant engaged in "an unfair or deceptive act [and] that such act proximately caused [his] alleged injury." As for the latter, defendant argues that, for the same reasons there is no standing, plaintiff fails to plead that defendant proximately caused plaintiff's injury. As for the former, defendant asserts that its alleged conduct—"proceeding with an automatic payment in the amount of the Statement Balance, rather than modifying the automatic payment to reflect a manual payment made after the billing cycle closed but before the scheduled payment"—"cannot be unfair or deceptive as a matter of law because [defendant] did precisely what it told [plaintiff] it would" do. According to defendant, the cardholder agreement tells "customers that 'Statement Balance' for automatic payment purposes means the 'total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement.'" It is therefore "self-evident," defendant asserts, "that manual payments that a customer makes . . . after the billing cycle closes and the statement is issued cannot change the balance shown on the already issued statement." (Emphasis removed). So plaintiff's understanding "that the automatic payment amount would . . . reflect manual payments made after the Closing Date . . . is directly contrary to how the Agreement defines 'New Balance Total,'" and is thus "unreasonable as a matter of law.'" (Citation omitted).

17

In response, plaintiff argues that defendant's "confusing Cardholder Agreement and website disclosures do not put a reasonable consumer on notice" that defendant will "improperly overcharge[ ] them because its AutoPay system is programmed to unexpectedly withdraw payments exceeding what is owed from their bank accounts." According to plaintiff, defendant cannot "identify any clear disclosure that its AutoPay system will debit a payment regardless of the actual balance owed on the payment date." To the contrary, plaintiff contends, defendant's "statements about its AutoPay feature . . . disclose only that the selection causes a statement balance to be paid off but does not explain that [defendant] will double bill if an intervening payment is made," and therefore "has a tendency and capacity to mislead." Defendant, plaintiff asserts, "stands alone in the banking industry with this confusing system." And "when it is in [defendant]'s financial interest," plaintiff notes, defendant can "recalculate the statement balance '[i]f a payment is credited to [the] account but is returned unpaid.'" (Quoting Agreement). Finally, plaintiff notes that defendant's representative "admitted that many other consumers were also deceived."

The court finds that plaintiff has plausibly pled that defendant engaged in an unfair or deceptive practice. "Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." Johnson v. Ford Motor Co., No. 3:13-6529, 2015 WL 7571841, at *13 (S.D.W. Va. Nov. 24, 2015) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)). "'Ordinarily, once the [facts of a case have been found], the court . . . then determines, as a matter of law, whether the defendant engaged in unfair or deceptive practices in or affecting commerce.'" Id. at *15 n.20 (brackets in original) (quoting Walker v. Fleetwood Homes of N. Carolina, Inc., 653 S.E.2d 393, 399 (N.C. 2007));

18

see also Carpenter, 132 F.4th at 287 (whether a "practice is unfair or deceptive 'is a question of law for the court.'" (citation omitted)).

"A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Carpenter, 132 F.4th at 287 (citation omitted). And "a practice is deceptive, even if it was a true statement that did not actually deceive the plaintiff, so long as the act 'possessed the tendency or capacity to mislead, or created the likelihood of deception.'" Johnson, 2015 WL 7571841, at *13 (quoting Chastain v. Wall, 337 S.E.2d 150, 154 (N.C. App. Ct. 1985)). "[I]n determining whether a particular act or practice is deceptive, its effect on the average consumer is considered." Id. (cleaned up).

Here, plaintiff has plausibly pleaded that defendant's practice had the capacity to mislead an average consumer. The agreement (which the court may consider, as it is referred to and central to the complaint, Williamson, 714 F.3d at 436) provides, among other things, the following statements:

- A "billing cycle" is a time period that ends on a Statement Closing Date (or Closing Date) determined by us and begins on the day after the Closing Date of the previous billing cycle. Each monthly statement reflects a single billing cycle.
- New Balance Total (also referred to as the "Statement Balance") is the total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement, plus any adjustments for subsequently returned payments.
- You may pay the entire amount you owe us at any time. . . . If you overpay or if there is a credit balance on your account, we will not pay interest on such amounts.
- Payments are allocated to posted balances.
- You may set up automatic payment arrangements online and/or through your mobile device. Where these arrangements refer to "Statement Balance" remember that is the same term as "New Balance Total" as it is used in the Agreement.

19

- If you think there is an error on your statement, . . . You must contact us: . . . At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

So, as defendant argues, the agreement does convey to customers that the "Statement Balance" is the "total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement." But contrary to defendant's assertion, it does not follow that plaintiff's understanding "that the automatic payment amount would . . . reflect manual payments made after the Closing Date" is "unreasonable as a matter of law."

As plaintiff points out, defendant identifies nothing in the agreement that explicitly tells consumers that defendant will continue with the autopay if "an intervening payment is made." And the agreement explains that the "New Balance Total" "is the total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement, plus any adjustments for subsequently returned payments." (Emphasis added). This could plausibly suggest to an average consumer that if the balance can be adjusted upward for post-closing events, it will similarly be adjusted downward for post-closing events like manual payments. That suggestion is bolstered by the fact that the agreement expressly tells customers that they "may pay the entire amount [they] owe [defendant] at any time," and that the complaint alleges that a downward adjustment after a manual payment is common in the banking industry. The complaint also alleges that defendant's representative explained that she "had been fielding calls from many [defendant] customers who were experiencing the same issue" as plaintiff—further lending plausibility to plaintiff's assertion that the challenged disclosures had the capacity to mislead the average consumer.

In short, the court cannot determine at this stage that an average consumer would not have been misled as a matter of law.

Defendant's assertion that plaintiff failed to plausibly allege proximate cause fares no better. To succeed under the NCUDTPA, the plaintiff must "demonstrate that the act of deception proximately resulted in some adverse impact or actual injury to the plaintiff[ ]." Pope v. TT of Lake Norman, LLC, 505 F. Supp. 2d 309, 313 (W.D.N.C. 2007) (cleaned up). Plaintiff has plausibly alleged proximate cause here. As explained above for standing, plaintiff plausibly alleges that defendant's auto-debit of funds to which they were not entitled directly injured him. And based on the allegations, loss of access to his funds was the type of injury that was a reasonably foreseeable result of defendant's alleged misleading conduct. And based on that misleading conduct, it is also plausible that it was foreseeable that plaintiff would make a manual payment without cancelling the autopayment, and would reject defendant's day-before offer to refund his manual payment given the autopayment was still going forward.

The court therefore denies defendant's motion to dismiss Counts I and II.[3]

### Count III

In Count III, plaintiff alleges that defendant breached the implied covenant of good faith and fair dealing under North Carolina law when defendant debited more than what it was actually owed. North Carolina "recognizes a cause of action for a breach of the implied covenant of good faith and fair dealing." Nadendla v. WakeMed, 24 F.4th 299, 307 (4th Cir.

---

[3] Defendant argues in a footnote that the NCDCA provides the exclusive remedy here, such that that plaintiff cannot pursue a claim under both the NCDCA and the NCUDTPA. But the complaint expressly pleads Count II (NCDCA) "[i]n the [a]lternative." Doing so is permitted under the Federal Rules. Fed. Rs. Civ. P. 8(d)(2) and (3). The court thus rejects defendant's argument for dismissal of the NCUDTPA claim on this basis.

2022). This cause of action is a "contract claim." GB Grp., LLC v. Bulldog Nat'l Risk Retention Grp., Inc., No. 5:23-CV-00029-BO, 2023 WL 9514088, at *7 (E.D.N.C. Dec. 27, 2023). The thrust of it is that "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Nadendla, 24 F.4th at 307 (citation omitted). Therefore, "all parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose." Robinson v. Deutsche Bank Nat. Tr. Co., No. 5:12-CV-590-F, 2013 WL 1452933, at *11 (E.D.N.C. Apr. 9, 2013) (cleaned up).

Here, plaintiff does not allege a breach of any specific term in the agreement. But "[t]he fact that Plaintiff does not allege a breach of a specific provision of [the agreement] does not . . . doom h[is] [implied covenant] claim." Id. (citing Richardson v. Bank of Am., N.A., 182 N.C.App. 531, 556 (2007)). At the same time, "a claim for breach of the implied covenant of good faith and fair dealing fails when it is contrary to or inconsistent with the express terms of the agreement." GB Grp., 2023 WL 9514088, at *3; Liris S.A. v. Morris & Assocs., Inc., 496 F. Supp. 3d 931, 942 (E.D.N.C. 2020) ("an express contract precludes an implied contract with reference to the same matter" (citation omitted)). And the implied duty "is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise." Liris, 496 F. Supp. 3d at 942 (citation omitted).

Defendant argues that this is just what plaintiff is attempting to do here—he is asking the court to "imply and impose a new obligation into the Agreement requiring [defendant] to continuously update the automatic payment amount to reflect post-statement manual payments."

22

According to defendant: the agreement "could have expressly provided for such an obligation but did not"; "[i]mplying" that obligation "would contradict the Agreement's express terms," which provide that the "'Statement Balance' would be a fixed amount—i.e., the 'total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement'"; and defendant "complied with th[e] express requirement" that it would allocate payments to posted balances "when it applied the scheduled automatic payment to reduce [plaintiff]'s posted balance from zero to a $2,044.88 credit."

In response, plaintiff argues that defendant "breached its implied covenant . . . by depriving [him] of his right to receive the benefit of the Cardholder Agreement: the ability to 'pay your statement in full' and have that payment 'allocated to posted balances.'" According to plaintiff, defendant "abused its discretion under the Cardholder Agreement to debit more than the 'statement balance' after the statement balance had already been paid in full." Plaintiff further argues that defendant is wrong that the "Statement Balance" would be a fixed amount because the agreement states that "New Balance Total (also referred to as the 'Statement Balance') is the total billed amount as of the Closing Date of a billing cycle, as shown on your monthly statement, *plus any adjustments for subsequently returned payments*." (Emphasis by plaintiff). Finally, plaintiff argues, the agreement gives defendant "'the right to refuse any payment if that payment will create, or if the account already has, a credit balance,' confirming that [defendant] can prevent overpayments but chooses not to—thereby abusing its discretion to enrich itself."

While close, the court finds that plaintiff has sufficiently pled a claim for breach of implied good faith and fair dealing. Plaintiff plausibly pleads that, by not stopping its

23

autopayment after he manually paid the balance off and debiting more than what he owed, defendant interpreted or acted under the agreement in an abusive and unreasonable manner— even though defendant may have complied with the agreement's literal terms. That is enough to plead an implied covenant claim. See In re TD Bank, N.A., 150 F. Supp. 3d 593, 627 (D.S.C. 2015) ("[E]ven if TD Bank complied with the literal terms of the contract . . ., the plaintiffs still state a plausible claim that the *manner* in which the overdraft policy was imposed was abusive, or that the Bank's actions violated the implied covenant where they were in excess of the express terms to the plaintiffs['] detriment." (emphasis in original)); see also Tristan v. Bank of Am., No. SA CV 22-01183-DOC-ADS, 2023 WL 4417271, at *13 (C.D. Cal. June 28, 2023) ("Plaintiffs' claim for breach of the implied covenant . . . depends on whether the Bank has adopted an unreasonable interpretation of when a fraudulent Zelle transaction will be deemed unauthorized.").

Ultimately, whether defendant's conduct was in fact abusive and unreasonable is factual issue for another day. See Holmes v. Bank of Am., N.A., No. 3:12-CV-00487-MOC, 2013 WL 2317722, at *8 (W.D.N.C. May 28, 2013) ("What is reasonable is typically a question of fact, usually left for a jury to decide." (applying Florida law, which was "[s]imilar to North Carolina law")); see also Carolina Quarries, Inc. v. Martin Marietta Materials, Inc., No. 1:20CV1043, 2023 WL 3346673, at *8 (M.D.N.C. May 10, 2023) ("Determining whether a party to a contract acted in good faith is a question of fact determined on a case-by-case basis and thus often inappropriate for summary judgment." (cleaned up)). The court thus denies defendant's motion to dismiss Count III.

24

## Count IV

In Count IV, plaintiff alleges a claim of unjust enrichment under North Carolina law based on defendant unjustly profiting off excess debits. "The elements of an unjust enrichment claim under North Carolina law are: (1) plaintiff conferred a measurable benefit to defendant, (2) defendant knowingly and voluntarily accepted the benefit, and (3) the benefit was not given gratuitously." Guhne v. Ceridian HCM, Inc., No. 1:20-CV-925, 2021 WL 1165328, at *12 (M.D.N.C. Mar. 26, 2021) (cleaned up). "Under North Carolina law, an unjust enrichment claim is *available only in the absence of an express contract* between the parties." Richardson v. PCS Phosphate Co., Inc., No. 3:16-CV-00068-GCM, 2016 WL 4728109, at *5 (W.D.N.C. Sept. 9, 2016) (emphasis in original) (cleaned up); see also McManus v. GMRI, Inc., No. 3:12-CV-009-DCK, 2012 WL 2577420, at *9 (W.D.N.C. July 3, 2012) ("under the laws of North Carolina, a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties" (cleaned up)).

Defendant contends that the cardholder "Agreement's existence . . . requires dismissal of the unjust enrichment claim." Plaintiff disagrees, arguing that "North Carolina law and the Federal Rules allow parties to plead quasi-contractual claims in the alternative, even where there is an express contract."

The court finds that the unjust enrichment claim should be dismissed. An unjust enrichment claim "should ordinarily be dismissed where the existence of a governing contract is undisputed." Guhne, 2021 WL 1165328, at *12; see also LKQ Corp. v. Rutledge, 96 F.4th 977, 981 (7th Cir. 2024) (where "the existence of a contract between the parties is undisputed, an unjust enrichment claim will seldom survive a motion to dismiss" (citation omitted)). But

25

because "not every case involving a contract claim is clear cut, especially at the pleading stage," courts recognize that "plaintiffs may plead contract claims and unjust enrichment in the alternative."   Hernandez v. Illinois Inst. of Tech., 63 F.4th 661, 671 (7th Cir. 2023).   "This allows plaintiffs to proceed in situations where the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract."   Id.

As a procedural matter, though, plaintiffs may not incorporate by reference allegations of the existence of a valid contract between the parties in the unjust enrichment count, since this would seek relief that North Carolina does not offer.   See Richardson, 2016 WL 4728109, at *6 (because the "claim for unjust enrichment expressly incorporates by reference all of the allegations alleging the existence of an express contract," it "must be dismissed"); Howard v. Carroll Companies, Inc., No. 1:12CV146, 2013 WL 3791619, at *12 (M.D.N.C. July 19, 2013) (because the counterclaim "incorporates by reference all preceeding [sic] allegations, including those alleging the existence of the two contracts," the "claim for unjust enrichment . . . must be dismissed"); see also LKQ, 96 F.4th at 981 (explaining that "a party may not incorporate by reference allegations of the existence of a contract between the parties in the unjust enrichment count," and that "this pleading error prevents any unjust enrichment claim from going forward" (cleaned up)); Hernandez, 63 F.4th at 671 ("plaintiffs may not incorporate by reference allegations of the existence of a valid contract between the parties in the unjust enrichment count, because this would seek relief that Illinois does not offer" (cleaned up)).

Here, plaintiff expressly alleges in Count IV that "[t]he claims of Plaintiff and the Class members are governed by North Carolina law under their uniform card agreements with [defendant]," and expressly "incorporates by reference [into Count IV] paragraphs 1-64" of the

26

complaint, which make clear that the parties are operating under an agreement. These allegations sink plaintiff's claim. Although plaintiff also alleges that Count IV "is pled in the alternative to Count III to the extent required by North Carolina law," he fails to explain how the claim is in the alternative or how it falls outside of the express agreement. See Deltacom, Inc. v. Budget Telecom, Inc., No. 5:10–cv–38, 2011 WL 2036676, at *5-6 (E.D.N.C. May 22, 2011) (explaining that even if the party had explicitly pleaded unjust enrichment in the "alternative," "the failure to include any factual allegations supporting such 'alternative' claims" still "doom[ed]" the claim); see also Hernandez, 63 F.4th at 672 (finding that the allegation that "[t]his claim is pled in the alternative to, *and to the extent it is determined a contract does not exist or otherwise apply*, the contract-based claim set forth in the Fourth Cause of Action" overcame the fact that the claim incorporated by reference the allegations recognizing the existence of a contract (brackets and emphasis in original)).[4]

The court therefore grants defendant's motion to dismiss Count IV, and dismisses Count IV without prejudice.

## CONCLUSION

For the above reasons, the court grants in part and denies in part defendant Bank of America's motion [17] to dismiss all counts under Rule 12(b)(1) for lack of standing, and under Rule 12(b)(6) for failure to state a claim. The court denies defendant's motion to dismiss the complaint under Rule 12(b)(1) for lack of standing. The court also denies defendant's motion to

---

[4] The court notes that at least one court has explained that an "unjust enrichment claim is potentially an alternative theory of relief, should the plaintiffs' contractual claims fail," where "a part of the plaintiffs' theory of the case is that [the defendant's] overdraft fee policy *in practice* exceeded the bounds of what the express terms of the contract allowed." TD Bank, 150 F. Supp. 3d at 632 (emphasis in original).

27

dismiss Counts I-III under Rule 12(b)(6) for failure to state a claim. The court grants

defendant's motion to dismiss Count IV under Rule 12(b)(6) for failure to state a claim, and

dismisses Count IV without prejudice. Defendant is directed to file its answer to Counts I-III by

August 17, 2026. The parties are directed to file a joint status report using this court's form on

or before August 24, 2026.

So ordered.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:    July 27, 2026**

28